May it please the Court, Ada Fleger for Melvin Jackson. I'll focus my comments on Claim 2, or Claim 3 of Mr. Jackson's brief, the introduction of evidence of the shooting and robbery at Roy's Lounge. The introduction of that evidence meant that the jury deciding Mr. Jackson's fate was repeatedly shown graphic video of a violent attempted murder and callous robbery. They were told that Mr. Jackson participated in those crimes and they were repeatedly told that he had so far escaped punishment and continued a criminal lifestyle. None of this was relevant to any of them. I mean the problem that I have with something like this is to me plain error means it's so obvious the judge should have jumped up and noticed it, him or herself. So you've got this video playing. Where in this sequence is the judge supposed to jump up and suddenly go, oh my gosh, we need to turn this video off? It's a matter of a few seconds. How was the judge supposed to prevent this plain error in the absence of an objection? The video, the moment that Mr. Jackson was no longer possessing the gun is the moment that the video was no longer probative. Okay, and how did the judge know this? How did the judge know that these next few seconds aren't going to show possession of the gun by Jackson, but rather something else? I believe that the video was seen pre-trial in the suppression hearing, so it was also known at that point. As well, the video and its contents was discussed in several of the pre-trials. But no one objected. No one's saying we shouldn't show this. Okay, so the judge is supposed to know that when they bring it to trial, oh, this is the video I've seen before, and this is the point at which I need to cut it off. So the video and its contents and the fact that it involved an attempted murder and a robbery that occurred after the crime in question had been completed was discussed in several of the pre-trial pleadings. So, and I believe that the judge had seen the case, and certainly that would have been the easier... And you didn't raise this until your reply brief, right? No, it's raised as Claim 3 in the opening brief. That it affected substantial rights? That it was overly prejudicial? I thought you raised it first time in your reply brief. No, perhaps it wasn't clear in the opening brief. It's Claim 3 in the opening brief that the evidence was barred by 404B of the Code of Evidence. I believe there's additional argument as the government argues in their brief that the evidence wasn't covered by 404B. So if we were to accept your argument and rule your way, then we would be expecting district judges that any time anything's going to be shown to the jury, they should review it first. They should determine whether it's relevant. They should determine whether the probative value outweighs the prejudicial effect, blah, blah, blah, and do all that sua sponte, without being asked, and without necessarily knowing that the entirety of this video that they've seen before is necessarily going to be played again. That's the rule we would be announcing going forward. I think there are two responses to that. First, to the extent that this evidence is covered by 404B, it would be the subject of pre-trial disclosure anyway, which would mitigate some of the concerns that Your Honor has about that issue. Also, as it is on a plain error review and requires this Court's discretion, this is, I've never seen a case this egregious where an event that was entirely separate causes this much prejudice. So I don't think that- All the more begs the question, Judge Haines, as to why there was no objection. If it's so bad, you know, it's not like it's hidden. People file motions and eliminate. You know, sort of all of that. So we get these, you know, big ticket issues on plain error. So even assuming error, you know, it's still a discretionary call in terms of, I mean, you're arguing it, I get it, but it's plain error. You know, was it error given the context in which it arises? If you say it was shown before, so it's not like there's any surprise, you know, it's there, it's moved along. Was there, you just said a minute ago, I think that it was argued to the jury, whatever it was you said, but I'm assuming, well, I won't assume anything. Were there requests for a, you know, a limiting instruction? In other words, in the trial, okay, once it's shown, Your Honor, would you give the jury a limiting instruction? Time, it's over. And then, of course, another instruction when the jury was sent back, was that ask of the judge to mitigate any prejudice? No, neither of those things were asked of the judge. Were there any objections to assume the judge gave the Fifth Circuit charge? Is that correct? Yes, Your Honor. All right, so was there any objection to the Fifth Circuit pattern charge given to the jury in terms of how to handle this kind of evidence? No, Your Honor, the only objection at all in the record is that toward the end of the video, we're not sure where, given how it appears in the record, toward the end of the video, trial counsel does object to continuing to play the video, discussing how it's gratuitous to have the... All right, so my question then to you is, given the questions I just asked you and your answers, how do we eclipse all of our case law to get to prong three of four here, when all those other remedies were available? In other words, if the district court refused to give a limiting instruction, district court didn't give the pattern, defendant asked for a special instruction, and the court denied them, if you had all that, maybe. But I'm just saying, how would you articulate a holding from this panel to say, we invoke prong three of plain error, but all these other things did not occur? So, I believe, I mean, any time you're on plain error, you're there because there was no objection, and this court has recognized that while forfeiture is, you know, is the law of the land, it's not absolute, and that's why there is a plain error review standard, because occasionally there are errors that are so egregious that they call out for this court's review. At prong three of plain error, certainly this court would be determining whether or not it affected his substantial rights. So in this circumstance, whether the violent attempted murder and the callous robbery inflamed the jury to the point that it impacted their judgment. At prong four, which I think is your Honor's question as to the exercise of discretion from this court, that would be a fact-specific determination that this court, I'm not sure that it would have all that much precedential value in other cases, though certainly it would be cited in other cases, but prong four is a case-specific and fact-specific determination. Let me ask you this, which kind of draws upon whether there was really even an error, and why I think perhaps there was no objection, and that is, wasn't there some dispute about whether that was Jackson in the video? The, I mean, certainly they argue that it was not him. Okay, and so this is a few-second video of which we show him with the gun, which is the key point, but is it him? Well, we see him again gawking over there and robbing the victim who's been shot, so we get to see him a little bit more. So in this fairly short video where we're trying to decide if this is Jackson, and we see him essentially twice, isn't it part of the video in determining identity to identify Jackson by seeing him again? Because if I see somebody for a second, wait a minute, I've got to see that again, now I see him again, I have a little more time to look at him, now I can better identify is that Jackson or not, as the juror or anybody else. I think there are a couple of answers to that. First, the government has never alleged that this was introduced for 404B identity evidence. Second, the video is actually, I think, about 15 minutes long before it gets to this point. There's two shots. There's the shot outside surveillance, and then there's the inside in the back room of Roy's Lounge where there's the dice game happening, and the record makes clear that the jury's looking at both of those, so looking at the dice game before they look at what happens outside. So how much of the video did the jury see? I'm not certain of exactly how much of the inside gambling evidence was shown, just because it's not entirely clear from the record, but my understanding is that they saw the entirety of the video, which I think is about 16 or 17 minutes long, at least the first time that it was shown. Before you run out of time, would you get to your argument on the enhancement and let me know what effect, if any, it would have on the sentence if the four-level enhancement was reduced to a two-level? The impact on the sentence would be, I'm sorry, I don't have the exact range in front of me, but certainly given the fact that the government had the burden of persuasion as to that and didn't carry that burden, the two-level reduction would, I'm sorry, I don't have the exact guidelines calculation in front of me, but it would reduce it by... Maybe on rebuttal, you can address it. Thank you. Is there no further questions, or is there a remainder of my time for rebuttal? You're done? Okay. All right. All right, Mr. Sandman? Good morning, Your Honors. May it please the Court, I'm Jeff Sandman for the United States, and I'm here today with my colleague, Ryan McLaren. Were you trial counsel? I was not trial counsel, Your Honor. I took the case at the appellate stage. The District Court did not err, much less plainly so in admitting video implicating Melvin Jackson in a shooting and robbery outside of Roy's Lounge. Now, Jackson argues on appeal that had the government pressed stop at any time after the handgun were pulled from his waistband, that the government would have lost nothing of evidentiary worth in proving the felon in possession count. This simply isn't true. To prove the felon in possession count, the government had to show three things. It had to show first, knowing possession of a firearm. It had to show second, prior felony conviction. And third, that the firearm traveled in interstate commerce. Now, the shooting depicted in the video helped establish two of these elements directly. First, the video connected the gun to the casings found at the scene, helping the government establish the interstate nexus element here. The government presented at trial an interstate nexus expert. He examined four shell casings found outside of Roy's Lounge and one live round. He testified that these were .45 caliber casings, and they bore the markings of companies who did their manufacturing outside of the state, South Korea and Illinois, respectively. These bullets necessarily traveled in interstate commerce. But only with the introduction of the video of the shooting could the government connect those bullets to Jackson's handgun. Remember, this was an interesting case in that there was no gun ever recovered here. No firearms expert was ever able to testify what Melvin Jackson's gun was based on looking at it. In fact, the — Not only that, there was no victim identified. There were no medical reports. Why were there no medical reports put in the record of the victim? Your Honor, there were no medical reports, in part because we didn't know who the victim was. was taken to the hospital and left and clearly didn't want to cooperate in this case. Well, but the medical records would have been at the hospital. The medical records would have been at the hospital, but my understanding is that trial counsel at the sentencing stage just didn't see any compelling need to present this. This is one man who was shot several times from virtually point-blank range in the abdomen, not in the finger or the toe, but in the heart of his body. Well, but trial counsel also argued at sentencing that the injuries were serious. He didn't argue that they were permanent or life-threatening. I think his use of serious was a colloquialism there and not a — Well, it's a legal term when you're talking about enhancement. It's a legal term, but if shooting somebody in the abdomen from a few feet away several times with a .45-caliber handgun doesn't meet the standard for permanent or life-threatening injury — Well, why is it permanent? Well, I mean, there's cases, Your Honor, that any scarring is permanent. So then anyone who gets shot — Well, if it's de minimis, I think there's a case — You're talking about scarring. Sure. But if it's — I suppose that if it's — if there's scarring and it's prominent enough, then it would meet the standard. There's a de minimis exception to this. I think that's what they meant. Well, there's a case — I think permanent bodily injury or life-threatening bodily injury is way beyond scarring. Well, Your Honor, there's case law to the contrary. The minor case from the Eighth Circuit, 2003, indicates that both scarring and a bullet remaining in a body, in fact, constitute — You don't know that. You don't know that the bullet was remaining. No, but we know either or. We know that either the bullet was removed or it remained. I mean, it's — I don't understand how this Court could presume that someone could be shot from mere feet away and have it not present a serious risk of bodily injury. Again, this isn't something that applies — It has to be life-threatening. It has to be life-threatening, Your Honor, but this — Serious is the two-level. Serious is the two-level. That's — Four-level. That's correct, Your Honor. It has to be serious — or, excuse me, life-threatening — life-threatening or permanent. And, you know, again, this case might be different where he's shot from a long distance with a BB gun in the torso or where he's shot at point-blank range in the hand or the foot. But when you're shot at point-blank range in the torso, it necessarily is going to carry a substantial risk of death or a substantial risk of permanent injury just by the very nature of the act itself. And if the court were to require more evidence in this case of that — of the injury here, then it would be difficult for the government ever to prove a four-level enhancement in a case where the victim isn't cooperating. Unfortunately, down here in New Orleans especially, we often have victims who don't want to cooperate with police when they've been harmed. But you can still get access to the medical records. Could still get access to the medical records. Could still get them today? That I'm not — I'm not sure, Judge. But, again, I don't even — You're wrong about the four-level, and it goes back. I'm not even sure how we would go about maintaining or possessing those records when, again, the victim gave an alias. Just not — Do you know what hospital he went to? We do know what hospital he went to. Surely there's some record time, place, and — And those records were not — If a patient comes in with four shots to the abdomen, I bet that could be tracked down easily. Those records weren't received, and they weren't entered into evidence. Right. Again, I think the case law is clear enough that when there's such an obvious act that just necessarily would result in a particular injury, that it satisfies the standard for the four-level enhancement in this case. But I would caution that if the court disagrees on this point, the proper response is to remand to the district court for resentencing. It's not to vacate the judgment in this case. What's the difference in the two-level and the four-level in terms of time served? Well, Your Honor, again, the judge — I'm not certain what the guidelines difference is, but I will say the judge — Oh, I'm sorry. The judge departed up. The judge wasn't interested in the guidelines in this case. He sentenced Mr. Jackson to 30 years in prison where the original guidelines were substantially less. So a full enhancement argument might not even matter. It wouldn't even matter, Your Honor. The guidelines range in this case was 262 to 327 months, and Melvin Jackson was sentenced to 360 months, in part not just because of the content of his actions in — with respect to the charges for which he was convicted, but also because of the relevant evidence presented at trial that he had shot yet another man. Not presented to the jury, of course. Presented at sentencing. Did the judge say it didn't matter to the degree of variance what the guidelines range was? There wasn't that magic language. And so after Molina, Martinez, or whatever the U.S. Supreme Court case is on this, are we required to remand when it's not clear, particularly on preserved error, that the judge didn't consider the guideline even for a degree of variance, even to say, well, okay, I don't think the guidelines are quite adequate. I'm going to vary upward, but I'm varying upward from what? So Molina, Martinez is a difficult case for us on this point. And, again, we're not here on plain error review. No, I understand. That makes it harder for you. It does, Your Honor. So, again, if we think that the nature of the act, the fact that four casings were found on the scene, four .45 caliber handgun casings, where a shooting occurred just mere feet away and the injury was sufficient enough that EMS appeared on the scene, if you watch the entire video, the man is on the ground long after Melvin Jackson leaves the scene. He's on the ground as police show up and as EMS appear on the scene. He's clearly in pain, which I understand does not establish the four-level enhancement in and of itself. But EMS found his injuries significant enough to take him to the hospital. And beyond that, the victim just didn't want to cooperate. And that's what we've got on appeal. So we believe that this is enough to satisfy the four-level enhancement. But, again, if the Court disagrees, then the proper remedy is, again, to remand for resentencing. But back for a moment, Your Honors, to the nature of the introduction of the entire video. We spoke for a moment about the interstate nexus piece and why the introduction of the video was important to connect the casings to the gun. Because the expert testified that he couldn't tell the caliber of the weapon, the place of manufacture of the weapon, anything about the weapon based on the grainy videotape in which the gun only appears for about a second or two. He needed those casings recovered from the scene to make certain inferences about that weapon. Once the casings were connected to the gun, the interstate commerce expert was able to testify that the gun necessarily also was a .45 caliber weapon and that it necessarily traveled in interstate commerce because no .45 caliber weapon. Let me ask you this. If we accept her argument that it's obvious he was the guy and he possessed it and so we don't need to see the rest of it, then isn't it also obvious that the conviction wasn't affected by that evidence? I mean, he didn't have to plead not guilty. And so having put the government to its burden, they're trying to meet that burden. I think you're exactly right, Your Honor. Again, there's a distinction between the Jackson versus Virginia standard in what level of evidence will withhold scrutiny on review for sufficiency. There's a difference between that and the government putting on compelling evidence to actually get a jury of 12 people to make a conviction. No, but I guess what I'm saying is if it is so obvious from the video that it's Jackson, he's possessing a weapon, then the rest of it should be harmless error even if it was error. It doesn't affect his substantial rights to put it in plain error language. It certainly does not. I mean, again, I'm sticking to whether there was error in the first place because I think any error in this case was absolutely not clear or obvious, and Jackson can't – Well, the hard part for me is just the judge having to jump up in the middle of this. I mean, even if you've seen the video before, this is kind of requiring the judge to go, oh, is this that video? Well, let's make sure those last five seconds aren't in there, you know, or let's have a big argument about it that no one's asked me to have. It just – I realize plain error puts a lot on the judge, but in these things about sentencing guidelines, I mean, the judge is supposed to review that. That makes some sense to me that we put that on the judge. But to put this on the judge seems to have no relationship whatsoever to how trials actually work. I completely agree, Your Honor. I think, again, we don't want to double count. We're here on plain error review. So we – it's difficult – you know, we don't want to double count in saying that the lack of an objection at trial just indicates, of course, that this simply wasn't that unfairly prejudicial. But I think that's the inference to be made here. And it bears mention that if there can be a video – you know, Jackson is arguing on appeal that this is a gruesome murder. It's really not, Your Honors. To the degree that there can be a video of an attempted murder that really lacks substantially unfair prejudicial effect, this is it. This video is black and white. The shooting in this video happens off screen. You don't even see the victim being shot. You don't even see the shooter pull the trigger. There's no blood in this case. It's a black and white video. There's no sound. You don't hear crying or asking for help or even the scary sound of a gunshot. And, again, Jackson himself didn't even do the shooting. Jackson possessed the gun and passed it off to his associate to do the shooting. But the fact that he's not the trigger man would reduce any prejudice to him in the first place. You heard my question to counsel opposite. Did the judge give a limiting instruction, you know, mid-trial when this comes on often when it's, you know, shown the judge will say to the jury, ladies and gentlemen, you know, yada, yada, yada. I mean, obviously at the end of the trial, but I'm satisfied no request for that was made. But some judges, just to be not knowing what the Fifth Circle will do, will just, you know, kind of cover the bases if any of that occur. Or from your standpoint, was this so innocuous, so to speak, that it didn't perk that reaction? Judge, to speak to the factual question, it didn't occur. There wasn't a limiting instruction. But at some point the jury was told that he was not on trial for any other crime. No, that's correct. That's correct, Your Honor. So that's a form of limiting instruction. It is, Judge. That was when the patent charge was given, right? That's correct, Judge. And as to your question about the impact of this evidence, again, I think trial counsel couldn't perhaps, you know, had trial counsel for Melvin Jackson had it over, he would have stood up and objected to this. But I think that objection would have been overruled. Again, this isn't a matter of introducing a distant, you know, a conviction in the distant past or some really unrelated future event. This is about introducing evidence of video of a shooting and robbery that's really part and parcel of the felonious possession offense. This video, from the time that Jackson's handgun is pulled from his waistband, the time at which Jackson argues the video should have been stopped, from that moment to the moment that Jackson leaves the screen after robbing the downed victim, we're talking 22 seconds, 22 seconds. This is not some event remote in time, place, and context. This is very much part of the same criminal episode, which is the language that this court used. You said it's not error at all. It's not error at all. It's not error at all, Your Honor. Again, had an objection been made at trial, firmly believed that the proper response from the judge would have been to overrule that objection. Again, you know, it's outside of the record. I'm not sure if the judge witnessed the video beforehand. Jackson says that the judge did. I have no reason to believe that isn't true. But, again, this is evidence that the trial counsel for Jackson was very aware of at trial. It's evidence that the judge was aware of heading into trial, and there's simply no reason to suspect. That's why I'm wanting to be clear. Again, this is my perception of plain error. It may not be others. But plain error is saying the judge should have fixed this, his or herself, without anyone pointing it out. And that, to me, in a case like this, is kind of weird. And, rather, I'm just not sure mechanically when it is the judge is supposed to jump up and go, ah, we've got to stop right here, and on their own, with no one ever saying anything, particularly if this video has been shown over and over pretrial and we've been talking about nothing but the video for the last, you know, 10 months, and now all of a sudden the judge is supposed to be the one that objects. I understand that's, you know, they still have a plain error argument. It's forfeiture. I'm not disagreeing with the standard review. I'm just thinking what is the impact of our ruling in your opponent's favor, and it concerns me. I completely agree. I think had the trial judge sua sponte decided to exclude this evidence, that would have been stepping on the toes of defense counsel, who may have found it proper trial strategy not to object at trial or even not to file motions in limine to exclude this evidence. Again, the issue of identity was raised at trial. And, again, because Melvin Jackson and the shooter aren't even present on screen when the shooting happens, identity was at issue during the trial in this case. Was there an allegation that Jackson was the shooter? No, there was no allegation from anybody that Jackson was the shooter. But there was allegation, in fact, there's allegation on appeal here with respect to one of the guidelines issues that there was insufficient evidence even under the lesser preponderance of the evidence standard that Jackson's gun wasn't even used in the shooting, that it was somehow a mysterious second shooter who came, you know, cruised in at the last minute and pulled the trigger. I'm not going to engage with that argument because I don't think it's one of the stronger ones that Jackson proposes. But, again, this is just by way of saying that this absolutely was contested both at trial and remains contested on appeal is Jackson's role in this. Your Honor, not to beat a dead horse, we spoke about the interstate commerce element. I just wanted to speak for a second about another aspect in which this video was necessary for the government to prove its case, and that's with respect to the operability of the firearm. To prove knowing possession of a firearm, the government had to show that the gun that Jackson possessed was, in fact, a firearm. That's a term of art as defined in 18 U.S.C. 921 as a weapon that will or is designed to or may readily be converted to expel a projectile by action of an explosive. Again, this was a weird case in that a gun was never recovered and was never presented. The only way or the best way that the government could demonstrate that the gun is what it appeared to be was by showing video of the gun being fired and the results of that firing. We talked about this a bit in our 28-J letter, the Roszkowski case from the First Circuit, which, again, just affirmed a conviction in a case that involved the testimony of a police officer indicating that a gun had been discharged because that discharge proved operability. Was the shooter charged? In this case? In the video. In the video, he was not. No gun, no shooter, so we know what happened there. And we were rolling our eyes about this across the street. I don't know why. Again, this Melvin Jackson— Was he identified? He was. His name is Marvin Doakes. He's identified in the briefing. So you're saying the State didn't prosecute him? This is outside the record, Your Honor, but to my knowledge, even to this point, I don't believe the State has prosecuted him. Melvin Jackson was charged with attempted murder for this in the State system, but, again, he was released on bond by the time of this case. So you picked up the firearm offense? Excuse me, Judge? So the U.S. Attorney's Office just picked up the firearm offense in the conspiracy? That's exactly right, Your Honor. So I want to speak just for one more moment about the 403 calculus here, which I think is where Jackson hangs his hat. Again, we talked about the fact that this was a grainy video, a black-and-white video, and that, again, the question at 403 stage is not whether there was any risk of unfair prejudice, but whether the unfair prejudice substantially outweighed the probative value of the video. We talked the probative value was necessary both for the government to prove these two elements of its offense and also just to provide the relevant background, the res gestae, as they say, about the event. Again, we're talking a 20-second period from the moment that the handgun is revealed to the moment that Jackson is off the screen and out of the picture for good. So this probative value is enormous here. And the risk of prejudice, while we won't get up here and say there's no risk of prejudice, that prejudice simply isn't that unfair. It's part of the same incident in which Jackson possessed this firearm. And comparing this case to the Cunningham case cited in reply brief, it's hard not to chocolate the comparison. That was a case about gruesome, brutal child rape. It's not even in the same ballpark in terms of unfair prejudice that we face here. So, Your Honor, for the reasons discussed and the reasons in our brief, we'd ask this Court to affirm the conviction and sentence. I see I'm out of time. Thank you very much. Thank you, Mr. Chairman. All right, Ms. Feger, rebuttal. Your Honor, first turning to the guidelines issue, I'd like to read the definition of serious bodily injury that's in the guidelines. Serious bodily injury is injury involving extreme pain or protracted impairment of a function of a bodily member, organ, or mental faculty, or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. It's unclear how the government's arguments about what happened don't also fit within that. Also, in the probation officer's responses to the objection to the PSR, so at page 628 of the record, the probation officer says that the government indicated to them that the government possessed medical records, which would demonstrate this issue. So to the extent that there is an argument that the medical records have not been obtained by the government, I think the record belies that point as well. But then were never presented to defense counsel. As far as I know, they were never presented to defense counsel or was not counseled. What about the fact that there was an upward departure, so this enhancement really wouldn't matter if you win on your argument? I think that Judge Haynes is correct that Molina-Martinez demonstrates that the guidelines remain the lodestar throughout proceedings, even where there's an upward variance from the guidelines. Still, the correct guidelines calculation must be the starting point, so we can infer that it impacted the sentence imposed, even where the sentence is outside. What would the differential be between the two and the four? I believe that the bottom of the four is the top of the two, so 292 months would be the top of the new guidelines instead of the bottom of the old guidelines. So it would be significantly below the sentence imposed. So what's the relief you want on the sentencing issue, given that the judge departed upward? I think that it would need to be remanded for resentencing on all three of the counts, since they were all— But if the PSR reflects that the government said, we have medical records that would show it was a life-threatening injury and no one objected to that conclusion in the PSR, can that form a basis for the district court's decision? In their response to the defendant's objection, saying only that the government has indicated that they, the government, have possession of the medical records, it doesn't make— That would show that. It doesn't make a representation that the probation officer has reviewed those or that they are asserting them as fact. So I think that those two facts make it so that while you can rely on facts that are presented in the PSR, I don't think that these can be rightly cast as facts in the PSR. It's only a mention that the government has some medical records that they, the government, believe sufficiently demonstrate this. Turning to the original issue, Issue 3 in Mr. Jackson's brief, I wanted to highlight just a couple of things. First, on the interstate commerce element, there are several district court cases in the Eastern District that demonstrate that no firearms are manufactured or mass-produced in the state of Louisiana. So to the extent that this attenuated description of the casings found on the ground are probably casings from the gun that's no longer on the screen but that had been taken from Mr. Jackson's waistband, certainly there was a more direct route for that evidence. So while the firearms expert did testify that the .45, he was unable to identify whether or not— But you were saying it was totally irrelevant. He's making a way that it is relevant and then you get your .403 balancing and all that, but it seems like that's at least an argument that it's relevant. I mean, although there might be a different way to prove something, that doesn't make it wrong for the government to prove it this way. Certainly that would make it more relevant, but as the Supreme Court has noted in Old Chief, there's a difference between .401 relevancy and then the probative value of the— No, I understand. Then you're to your .403 weighing. Exactly. So to the extent that this Court finds that at all probative, I would think that the prejudicial value would significantly outweigh that. Where there's other evidence that's available, that's one of the considerations. But I think when you're talking about plain error, showing that something's completely irrelevant and also very prejudicial is a better place to be than where it's relevant and also prejudicial, right? Yes. In terms of affecting substantial rights. Certainly having things that are entirely irrelevant is always preferable. Here, though, the gun that Mr. Jackson removed from his waistband was offscreen at the time, as was Mr. Jackson, so the probative value of this is significantly low. And finally, to the government's argument that this was not a particularly prejudicial video, I think that that is belied by the record and also by common experience. From almost all of these jurors, this would be the first and only time that they'd ever seen a real person shot and that they'd ever seen a real person robbed. And certainly while— I don't know about that. I mean, you see this stuff on television all the time, real and fictional. I mean, I think you see it fictionally much more often, Your Honor. But looking at the— Yeah, but I don't know that I can assume that nobody's ever seen a real person shot when every night on the news somebody's getting shot and we're seeing videos of it. Police dash cams and body cams and all this kind of stuff, it's become, unfortunately, quite commonplace to see people being shot. Thank you, Your Honor. Hang on, Judge. For Mr. Sandman, as a follow-up to what the public defender— the allegation that the pre-sentence report referred to the U.S. Attorney's Office having medical records, would you follow up on that and see if that's correct or not? Sure, Your Honor. Would you like me— Could you send us a letter brief within five days? Of course I will. As to whether the— Whether the allegation is correct. I see, Your Honor. I'm happy to. All right. Thank you, sir. Thank you, Your Honor. All right. Thank you, counsel, for your briefing and argument. In case you want to submit it, subject to the follow-up. All right. We'll call the next case up. Fairley v. Hattiesburg, Mississippi, et al. Thank you.